**Joseph BENEDICT, Plaintiff,**

v.

**Margaret HECKLER, Secretary of the Department of Health and Human Services, Defendant.**

No. CV 83–3864.

United States District Court, E.D. New York.

Aug. 17, 1984.

---

Yannacone & Yannacone by Michael T. Sullivan, Patchogue, N.Y., for plaintiff.

Raymond J. Dearie, U.S. Atty., by Patricia T. Galvin, Asst. U.S. Atty., Brooklyn, N.Y., for defendant.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

This is an action brought pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to review a final determination of the Secretary of Health and Human Services (Secretary) denying plaintiff's application for disability insurance and Supplemental Security Income (SSI). The parties cross-move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

Plaintiff applied for benefits on January 18, 1982. A hearing was held by an Administrative Law Judge (ALJ) on March 16, 1983, at which time plaintiff changed his alleged date of disability from October 25, 1980 to March 12, 1981. On April 30, 1983, the ALJ denied plaintiff's application on the grounds that plaintiff refused, without justification, to follow prescribed treatment that would substantially improve his condition. 20 C.F.R. Section 404.1530. This determination became the final decision of the Secretary when approved by the Appeals Council on August 3, 1983.

## FACTS

Plaintiff, Joseph Benedict, is a thirty-two year old veteran with a high school education. In 1972, he was drafted into the U.S. Army and served nine months before receiving an honorable discharge. Subsequently plaintiff held a variety of jobs including bakery worker, auto mechanic and security guard until October 1980. During this period, plaintiff drank heavily, often one case of beer each day. Plaintiff still continues to drink heavily on occasion. On January 5, 1981, plaintiff was admitted to the Veterans Administration Hospital (VA) complaining of alcohol dependence, antisocial behavior and violent outbursts. He also complained of severe headaches, perhaps caused by a nasal condition for which he later underwent surgery. Plaintiff was given psychotherapy and treated with Mellaril. He was discharged on February 6, 1981, but readmitted four days later. He was released shortly thereafter but continued outpatient treatment that included taking Dalmane and Serax, which are mild tranquilizers and antidepressants. On March 10, 1981, Mr. Benedict was given a renewal prescription for Serax. The VA hospital pharmacy mistakenly filled the prescription with Stelazine, a very potent antipsychotic drug.

On March 12, 1981, plaintiff reported to the VA for a work training session, having ingested 30 mg. of Stelazine thinking it was Serax. Unsurprisingly, plaintiff went into severe convulsions and suffered an acute dystonic reaction, including a severe arching of the back. Plaintiff was admitted to the hospital and treated, then released the following day. After release, plaintiff developed insomnia, caused by a fear of sleep resulting from the Stelazine reaction, and was placed on tranquilizers.

758

He also suffered a painful back injury from the severe arching during the drug reaction. Plaintiff continued to drink heavily.

From September 1982 through the hearing date plaintiff was seen by a number of doctors and psychiatrists. Physically, he was found to have a slight limp, limited hyperextension of the neck, lumbosacral sprain and some degree of arthritis. Mr. Benedict walks with the aid of a cane and, according to the report of Dr. Amini, a consulting physician, can sit for only two hours at a time and lift and carry only five to ten pounds. Plaintiff's alcoholism appears to be chronic. In addition, plaintiff was rather obese, having gained sixty pounds in a six month span attributable perhaps to prescribed medication, a sedentary lifestyle or alcohol use. Plaintiff discounted food as a reason, as he is a strict vegetarian.

Four psychiatrists examined plaintiff at different times during this period. The first was Dr. Joseph who saw plaintiff once on September 10, 1982. At this point, plaintiff was on no medication other than Valium, and refused additional treatment. Dr. Joseph found plaintiff to be suffering from overt paranoid schizophrenia and alcoholism. Concentration and insight were poor. Dr. Joseph said plaintiff's diagnosis was poor because he was unwilling to take other medication. Plaintiff was next seen by Dr. Moon on December 4, 1982. His diagnosis was alcohol dependence and intermittent explosive disorder. Plaintiff continued to refuse drug treatment. On December 22, 1982 plaintiff was seen for the last time by his then treating psychiatrist, Dr. Glenn. His diagnosis was borderline personality disorder characterized by restlessness, childishness, poor judgment, antisocial behavior and dependence. In Dr. Glenn's opinion plaintiff was incapable of functioning in a commercial establishment or paid work for the foreseeable future.

Lastly, the record contains a report of April 4, 1983 from plaintiff's treating psychiatrist, Dr. Wright. He indicated that plaintiff would have moderate to severe difficulty working in areas with more than minimal stress and social interaction, but could perhaps function in simple jobs with minimal social contact. He stated that plaintiff could probably benefit from antipsychotic medication, but refused to take it.

## DISCUSSION

■ The Secretary's determination denying disability benefits is conclusive if supported by substantial evidence on the record. Substantial evidence has been defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). In the present case, the ALJ's decision is comprised of three separate conclusions: First, that treatment was *prescribed;* second, that treatment would restore plaintiff's ability to work; third, that plaintiff was without justification in refusing this treatment.

■ In denying plaintiff disability benefits, the ALJ did not make an explicit finding that plaintiff was disabled; his decision was based solely on the fact that plaintiff refused to take "prescribed" medication. Nevertheless, it appears that inherent in the ALJ's decision is a finding of disability. A reading of 20 C.F.R. Section 404.1530 reveals refusal of treatment is a disqualification for receiving or reason for termination of benefits. It is not dispositive of the underlying disability. When gaps or omissions exist in the ALJ's decision, this Court may fill them in if "the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose." *Parker v. Harris,* 626 F.2d 225, 235 (2d Cir. 1980). All of the psychiatrists who examined plaintiff found him to be suffering from some mental impairment, their disagreement centered solely on the severity of plaintiff's impairment. "The mere fact that several physicians have diagnosed a particular claimant's mental condition differently does not compel a conclusion that the claimant is not suffering from a mental impairment." *Rivera v. Schweiker,* 560

F.Supp. 1091, 1095 (S.D.N.Y.1982). The regulations explicitly state that "the criteria for severity of mental impairment(s) are so constructed that a decision can be reached even if there are disagreements regarding diagnosis." Appendix I, Section 12.00 A. Moreover, the applicant for disability need not be a total basket case. *DeLeon v. Secretary of Health and Human Services*, 734 F.2d 930 at 935 (2d Cir.1984). In the instant case, even the least severe diagnosis, that is, borderline personality disorder, is listed under Appendix I, Section 12.04, which states in relevant part:

> 12.04 Functional nonpsychotic disorders (psychophysiologic, neurotic, or personality disorders; addictive dependence on alcohol or drug) with both A and B:
>
> A. Manifested persistence of one or more of the following clinical signs:
>
>   . . . .
>
>   7. Persistent, deeply ingrained, maladaptive patterns of behavior manifested by
>
>   . . . .
>
>   (b) a pathologically inappropriate suspiciousness or hostility;
>
> B. Resulting persistence of marked restriction of daily activities and constriction of interests and deterioration in personal habits and seriously impaired ability to relate to other people.

Clearly, persuasive proof on the record exists that plaintiff's behavior meets the above criteria. Dr. Joseph noted that plaintiff had numerous paranoid thoughts such as, "I don't like people walking behind me," "I don't trust people so I keep a gun at home ... that way no one can get me."

At the hearing plaintiff responded to the question if he felt that doctors are purposely trying to harm him with, "It could be, they seem to—they seem to have a way of doing that, yes." Plaintiff has always insisted that the Army and the Social Security Administration have purposely messed up his records. Such suspicious, even paranoid, ideas clearly fall within Section 12.-04(A)(7)(b).

As to Section 12.04(B), Appendix I, Doctors Glenn and Wright, plaintiff's treating psychiatrists, both stated that plaintiff showed marked impairment in dealing with other people and should avoid doing so. Plaintiff currently lives alone and by his own admission mostly just stays in his room. In the recent past, plaintiff's excursions into the outside world often ended in fights or brawls caused by his explosive personality. Therefore, the Court concludes that plaintiff has a listed disabling impairment under Appendix I.

The Court now turns to the ALJ's basis for denying benefits: Mr. Benedict's refusal to take prescribed treatment. Social Security Ruling (SSR) 82–59, discussing 20 C.F.R. Section 404.1530, states the following:

> An individual who would otherwise be found to be under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source which the SSA determines can be expected to restore the individuals ability to work, cannot by virtue of such "failure" be found to be under a disability.

Inherent in this ruling is a threefold test, each part of which must be "failed" by plaintiff for him to be refused benefits.

1. treatment must be *prescribed* by his *treating* physician;
2. such treatment must, according to SSA, restore his ability to work;
3. he must have no justifiable cause to refuse treatment.

In the instant case, the ALJ decided that plaintiff had failed all three parts of the test. Again, if substantial evidence on the record exists to support his conclusion, the Court is bound to affirm. The Court does not find that such evidence exists.

■  There is little guidance in the definition of "prescribed" in a refusal of treatment issue. The regulatory language of 20 C.F.R. Section 404.1530 fails to provide any definition. Decisional law has been scant and its analysis has been cursory. The leading analysis is set out in *Schena v. Secretary of Health and Human Services,*

635 F.2d 15 (1st Cir.1980), where the Court of Appeals for the First Circuit stated that "willful refusal to follow a *recommended* course of treatment disregards the language of the regulation which specifically speaks in terms of the willful failure to follow prescribed treatment. That various physicians suggested the operation does not necessarily mean they prescribed it." *Id.* at 19. From this the courts have reasoned that "prescribed" is something more than recommended or suggested. *Cassiday v. Schweiker*, 663 F.2d 745 (7th Cir. 1981); *Jones v. Heckler*, 702 F.2d 950 (11th Cir.1983). Further, decisions are made on a case-by-case basis, turning largely on their facts. In the instant case, plaintiff saw various doctors who stated that psychotropic drugs might or would help plaintiff. Plaintiff has rejected these since he suffered the horrible convulsions induced by psychotropic medication, but continues to take Valium. Some doctors have also suggested to plaintiff that he may wish to return to the hospital for observation and help in his diet. Plaintiff also rejects this, but does continue psychotherapy. Nonetheless, no evidence exists that any of these doctor's opinions rose to a level of "prescription." As the Secretary's test takes into account only prescription by a treating physician, the recommendations of the two consulting physicians are not particularly relevant. Most important is the assessment of Dr. Wright, plaintiff's current treating psychiatrist. In his report of April 4, 1983, he wrote plaintiff "would probably benefit from anti-psychotic medication." Looking at the tentative optimism in the phrase "probably benefit", the Court cannot say that he ALJ is correct in finding that such advice is anything more than a suggestion or recommendation. A prescription is expected to be more definite in its effect than "probably benefit," or a doctor to be more adamant in having his patient follow it than evidence shows Dr. Wright to be. There is no evidence on the record to support the ALJ's conclusion that plaintiff failed to follow *prescribed* treatment.

In any event, had treatment been prescribed, it must also be shown that it would restore plaintiff's ability to work. *Schena v. Secretary*, 635 F.2d at 19. None of the doctors on record appear to have discussed exactly what effect antipsychotic drugs might have on plaintiff.

As a rule, antipsychotic medication will sedate people who are manic or explosive or normalize those who are severely depressed. They are far less successful with patients whose problems are less behavioral and more ideological, among which are schizophrenics and paranoid personalities. At best, they may allow the patient to function minimally and quietly.

It is also prudent to have a clear diagnosis when using pychotropic drugs, since their effects can vary widely depending on patient's condition. For these reasons, Mr. Benedict's case presents serious problems in stating that psychotropic medicine would restore his ability to work. Mr. Benedict has been diagnosed at different times as paranoid schizophrenic, which is quite severe, and borderline personality, which is less severe. His inability to work stems from his explosive personality, which can be controlled, although not cured, by drugs, and his paranoid, highly suspicious mindset, which is much harder to control with drugs except ones so powerful that plaintiff would become so sedated as to be equally unable to work.

Finally, even if the treatment were prescribed and would restore plaintiff's ability to work, plaintiff may still refuse such treatment where justifiable cause exists. The regulations list the following, noninclusive examples of justifiable cause: treatment is contrary to one's religious tenets, the same surgery was previously unsuccessful, the surgery's very risky for the individual. 20 C.F.R. Section 404.1530(c). Similar exceptions are listed in SSR 82–59, which notes that "a full evaluation must be made in each case to determine whether the individual's reason(s) for failure to follow prescribed treatment is justifiable."

The overwhelming majority of cases in this area deal with the refusal of

surgery. In those cases, doctor's predictions of success, patient's fear of pain, or fear of the surgery itself and even the doctor-patient relationship are factors to be considered. *E.g., Jones v. Heckler*, 702 F.2d 950 (11th Cir.1983); *Cassiday v. Schweiker*, 663 F.2d 745 (7th Cir.1981); *Nichols v. Califano*, 556 F.2d 931 (9th Cir. 1977). The refusal, however, must be reasonable. Obviously, the situation is drastically altered when dealing with those plaintiffs with mental impairments. The "reasonable man" standard that is in essence used in "justifiable cause" (or "willful refusal" as it is sometimes called) is clearly not applicable to those persons who are not "reasonable." Someone who is truly paranoid or who is hallucinating, someone who may well believe that doctors "are out to get him" for no good reason is unlikely to accept treatment prescribed by doctors. To deny this person benefits for this reason, because he is not acting under a "reasonable fear" mocks the idea of disability based on mental impairments. The mere fact that the listed impairments include numerous mental disorders shows the Secretary's "progressive attitude toward mental illness." *Rivera v. Schweiker*, 560 F.Supp. at 1095. In cases involving the mentally ill, "justifiable cause" must be given a more lenient, subjective definition.

■ Although Mr. Benedict has a long history of psychological problems, his condition worsened significantly after March 1981 when he overdosed on the prescription of Stelazine erroneously given to him by the VA hospital. Although his experience was only a few hours long, it was quite horrible, taking the form of convulsions, loss of muscle control, arching of the back, and rolling of the eyes. From this point, plaintiff has grown increasingly paranoid, especially about medications. After such an experience, even the most reasonable individual might be wary of taking medication. Certainly, a psychologically disturbed person would justifiably refuse such medication, being less able to realistically assess the risks and benefits. In sum, even if the treatment were prescribed and could restore plaintiff's ability to work, jus-

tifiable cause does exist for plaintiff's refusal.

Finally, the ALJ discussed but made no decision regarding the plaintiff's claim to disability based on his back injury and alcoholism. As the Court finds Mr. Benedict disabled by his mental impairment it need not try to decide the additional claims or remand the matter to the ALJ for determination.

### CONCLUSION

The Court concludes that plaintiff has a disabling impairment under Appendix I, Section 12.04. Furthermore, substantial evidence on the record does not exist to support the ALJ's conclusion that the treatment refused by plaintiff was prescribed. Accordingly, the Secretary's determination denying plaintiff disability benefits is reversed.

The Clerk of the Court is directed to enter judgment in favor of the plaintiff and awarding disability and SSI benefits beginning March 12, 1981.

SO ORDERED.